UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Antoinette Reynolds,

   Plaintiff,

v.               MEMORANDUM OPINION AND ORDER

Officer Matthew Clark, individually   Civil No. 23-331 ADM/DLM
And in his official capacity, and
Metropolitan Airports Commission,

   Defendants.

___

Kenneth U. Udoibok, Esq., Kenneth Ubong Udoibok, P.A., Minneapolis, MN, on behalf of Plaintiff.

Ashley Marie Ramstad, Esq., and Susan M. Tindal, Esq., Iverson Reuvers Condon, Bloomington, MN, on behalf of Defendants.

___

## I. INTRODUCTION

On July 3, 2024, the undersigned United States District Judge heard oral argument on Defendants Officer Matthew Clark ("Officer Clark") and Metropolitan Airports Commission's ("MAC") Motion for Summary Judgment [Docket No. 33]. For the reasons set forth below, the Motion is granted.

## II. BACKGROUND

This lawsuit arises from Plaintiff Antoinette Reynolds' ("Reynolds") claim that Officer Clark used excessive force against her when he grabbed her arm and twisted it behind her back when responding to a call of an assault in progress in the baggage claim area at Minneapolis-St. Paul International Airport ("MSP").

The incident occurred on February 15, 2021. Reynolds and her husband arrived at MSP after a trip to San Diego and walked to the baggage claim area to retrieve their luggage.

Ramstad Decl. Ex. 1 [Docket No. 38] ("Reynolds Dep.") at 132:23-133:10.  As they approached the baggage claim area, Reynolds observed a woman, later identified as Alison Louise Baker ("Baker"), "making lots of ruckus" by yelling and screaming at other travelers in the area.  Id. at 134:6-16; Ramstad Decl. Ex. 3 [Docket No. 36, Attach. 2] ("Citizen Video").  Reynolds ignored Baker and walked to baggage carousel 7.  Reynolds Dep. at 134:11-19.

As Reynolds waited for her bags at the carousel, Baker approached her and yelled at her to take off her mask.  Id. at 135:14-19; Ramstad Decl. Ex. 6 [Docket No. 36, Attach. 5] ("Surveillance Video III") at 4:01-4:10.  Baker also shouted racially charged remarks at Reynolds, who is Black, calling her a "slave bitch" and saying Reynolds was "a slave just like your ancestors."  Reynolds Decl. at 135:19-23.  Reynolds told Baker to go away, and Baker responded, "F you, you slave."  Id. at 135:23-136:2.  Baker then walked away from Reynolds and began confronting and yelling at other travelers.  Id. at 136:5-10; Surveillance Video III at 4:10.

After Reynolds and her husband had collected their luggage, Baker approached them and again began to engage with them.  Reynolds Dep. at 137:8-23; Citizen Video at 1:13-115; Ramstad Decl. Ex. 5 [Docket No. 36, Attach. 4] ("Surveillance Video II") at 6:52.  Baker shouted at Reynolds' husband, calling him "stupid," and yelled at Reynolds to take off her mask. Reynolds Dep. at 138:1-7.  Reynolds then stepped toward Baker, pointed her finger in Baker's face, and told her she needed to back up.  Id. at 138:22-139:18; Surveillance Video II at 6:54-59.  A group of individuals were gathered around Reynolds and Baker during the interaction. Reynolds Dep. at 139:23-140:10; Surveillance Video II at 6:54-58; Citizen Video 1:23-25.

Minutes earlier, Baker's erratic behavior had prompted a bystander to call 911.  Ramstad Decl. Ex. 8 [Docket No. 36, Attach. 7] ("911 Audio Recording").  The bystander told dispatch

2

that officers were needed at carousel 7 as soon as possible because a woman was "fighting with everybody." Id. at 00:45-47. Dispatch radioed to MSP Airport Police Department officers that there was an "assault in progress" at carousel 7, and that "a female . . . was fighting with everyone." Ramstad Decl. Ex. 7 [Docket No. 36, Attach. 6] ("Police Reports") at 3, 5-6; Ramstad Decl. Ex. 2 [Docket No. 36, Attach. 1] ("Clark Dep.") at 24:23-25:7. No description of the suspect was given by dispatch other than the suspect was a female and was fighting with others. See generally Police Reports; Clark Dep. at 59:8-10.

Officer Clark was on the third floor of the airport when he received the radio call from dispatch. Clark Dep. at 28:3-6. Due to the urgency of the call, he ran to the first floor where carousel 7 was located. Id. at 28:11-14. As Officer Clark was running on the first floor toward carousel 7, he could see a group of people yelling and causing a disturbance. Id. at 29:4-8; 55:5-12. Officer Clark testified in his deposition that before he reached the group causing the commotion, he passed a man observing the group from a distance and asked the man who was fighting. Id. at 29:4-16, 55:9-25, 131:2-5. The man replied that it was the female with the white hoodie. Clark Dep. at 29:4-8, 55:23-56:2, 131:4-6 .

When Officer Clark approached the group, he observed that Reynolds was wearing a white hoodie and that she appeared agitated and was advancing towards another female with a gray coat (Baker). Clark Dep. at 57:23-25, 131:8-16; Surveillance Video II at 6:54-59. Reynolds had her hand up and was pointing at the woman in the gray coat. Clark Dep. at 131:14-16. Other people in the group appeared to be holding Reynolds back and pushing her away from the woman. Clark Dep. at 62:7-10, 131:19-22; Surveillance Video II at 6:54-59. Based on these observations and the information relayed from dispatch, Officer Clark believed that Reynolds was the potential suspect. Clark Dep. at 58:22-25.

3

Officer Clark was concerned that if he did not remove Reynolds from the situation immediately, someone might get hurt. Id. at 63:16-18, 64:15-16. Without announcing his presence or issuing a warning, Officer Clark attempted to perform an escort hold on Reynolds by taking hold of her arm with both hands and pulling and twisting it. Id. at 31:14-22, 131:23-25; Reynolds Dep. at 140:13-17, 141:17-142:3; Citizen Video at 1:25-29; Surveillance Video I at 7:01. Reynolds attempted to pull away, and Officer Clark continued to pull on her arm. Surveillance Video I at 7:02-10; Citizen Video at 1:28-32.

Officer Clark then heard an individual shout that Reynolds was not the person who had been fighting. Clark Dep. at 132:4-9; Citizen Video at 1:33-37. Upon hearing this, Officer Clark released his hold on Reynolds. Clark Dep. at 132:6-9; Citizen Video at 1:33-38; Surveillance video I at 7:06-09. As he did so, Reynolds turned and punched Officer Clark in the chest. Clark Dep. at 132:9-11; Surveillance Video I at 7:09-11. The entire interaction between Officer Clark and Reynolds lasted approximately ten seconds. Id. at 7:01-11. Officer Clark then approached Baker and placed her under arrest. Id. at 7:13-20.

Since the incident, Reynolds has experienced pain in her right shoulder and decreased feeling in the fingers of her right hand. Reynolds Dep. at 90:8-91:7. She visited her primary care clinic the day after the incident and was instructed to use heat, ice, and ibuprofen. Udoibok Decl. Ex. 1 [Docket No. 42, Attach. 1] ("Medical Report") at 2.[1] In September 2021, Reynolds began consulting with a sports medicine physician due to continued shoulder pain and weakness in her right hand. Id. at 3. The physician determined that Reynolds suffered trauma to her shoulder that is expected to resolve over time and is not anticipated to result in permanent disability. Id. at 4-5.

---

[1] Page citations to the Medical Report are to the page numbers in the CM/ECF banner at the top of the page.

On February 9, 2023, Reynolds filed this lawsuit against Officer Clark, in his individual and official capacities, and against MAC. Reynolds asserts three claims against Officer Clark: a claim under 28 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment (Count I); a state law claim for intentional infliction of emotional distress (Count II) and a state law claim for assault and battery (Count IV). See Compl. [Docket No. 1]. The Complaint also asserts a state law claim against MAC for negligent hiring, training, and supervision (Count III).

Defendants now move for summary judgment on all claims, arguing that qualified and official immunity bar Reynolds' claims against Officer Clark. In her Response to Defendant's summary judgment motion, Reynolds states that she has voluntarily withdrawn her claim against MAC. See Resp. [Docket No. 41] at 19 n. 2. At oral argument, Reynolds' counsel stated that Reynolds is no longer suing Officer Clark in his official capacity, and that the only remaining claims in this lawsuit are the § 1983 and tort claims against Officer Clark in his individual capacity.

### III.  DISCUSSION

**A.  Standard of Review**

Federal Rule of Civil Procedure 56 provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in its favor. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate

on the record the existence of specific facts which create a genuine issue for trial." Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation omitted).

**B. Section 1983 Claim (Count I)**

Officer Clark argues that he is entitled to qualified immunity against Reynolds' § 1983 claim for excessive force. Qualified immunity shields government officials from § 1983 lawsuits and liability "unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." LaCross v. City of Duluth, 713 F.3d 1155, 1157 (8th Cir. 2013). "In a § 1983 action, an officer is entitled to qualified immunity unless: (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established." Ching as Tr. for Jordan v. City of Minneapolis, 73 F.4th 617, 620 (8th Cir. 2023).

**1. Violation of a Constitutional Right**

Reynolds argues that Officer Clark violated her Fourth Amendment right to be free from unreasonable searches and seizures. She contends that Officer Clark lacked particularized suspicion to stop and detain her, and that the force he used against her was unreasonable.

**a. Stop and Detention**

"[B]efore a police officer can use physical force, the arrest or investigatory stop itself must be justified." Smith v. Appledorn, No. CIV. 11-2966 JNE/SER, 2013 WL 451320, at *3 (D. Minn. Feb. 6, 2013) (citing Andrews v. Fuoss, 417 F.3d 813, 817–18 (8th Cir.2005)). The Supreme Court has long held that "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Sokolow, 490 U.S. 1 (1989) (citing Terry v. Ohio, 392 U.S. 1, 21 (1968)). "In making reasonable-suspicion determinations, reviewing courts 'must look at the 'totality of the

circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Martinez-Cortes, 566 F.3d 767, 769 (8th Cir. 2009) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)).

Here, the totality of the circumstances show that Officer Clark had a particularized and objective basis for suspecting Reynolds of legal wrongdoing. Officer Clark had been dispatched to the baggage claim area with a report of an assault in progress. Dispatch relayed that a female was fighting with everyone at carousel 7, but did not provide a description of the suspect. As he approached carousel 7, Officer Clark observed a group of people that appeared to be arguing with each other, and was told by a bystander that the person who was fighting was the female in the white hoodie. Reynolds' head was covered with a white hoodie. Officer Clark also personally observed that Reynolds appeared agitated and was advancing toward Baker with her arm outstretched, while others in the group were pulling and pushing Reynolds away from Baker. The totality of these facts known to Officer Clark at the time of the seizure provided an objective basis at that time for believing that criminal activity may be afoot. As such, Officer Clark was justified in briefly detaining Reynolds to remove her from the potentially hostile situation and quell the disturbance.

Reynolds argues that the evidence, when viewed most favorably to her, does not support an inference that a bystander told Officer Clark that the person fighting was wearing a white hoodie. Reynolds contends that Officer Clark's deposition testimony about his interaction with a bystander is contradicted by video evidence, because the surveillance footage does not show Officer Clark slowing down or stopping to talk to anyone as he ran toward the group that was arguing in the baggage area. However, the surveillance footage (which does not include audio) shows that as Officer Clark ran toward the group, he passed by a man who appears to be pointing

7

out an individual in the group. See Surveillance Video II at 6:52-56. The video thus does not contradict but rather lends some support for Officer Clark's testimony. Additionally, Officer Clark's contemporaneous police report states that he asked a bystander to tell him who was fighting, and the bystander told him it was the female with the white hoodie. Police Report at 3.

Even if a genuine dispute of fact exists as to whether Officer Clark communicated with a bystander about who was fighting, that particular disputed fact is not material. Assuming that Officer Clark had not been told about the white hoodie, the facts known to him at the time he arrived on the scene were: there was an assault in progress at carousel 7; the suspect was female and was fighting with everyone; Reynolds was in a group of people that appeared to be arguing; Reynolds appeared agitated and was moving towards Baker with her arm outstretched; Reynolds was pointing in Baker's face; and individuals near Reynolds appeared to be pulling her back and pushing her away from Baker. These facts provided a particularized and objective basis for believing that Reynolds was engaged in legal wrongdoing. Accordingly, Officer Clark's brief detention of Reynolds did not amount to a constitutional violation.

Unfortunately, Officer Clark was mistaken in briefly concluding that Reynolds was the woman referenced in the dispatch report, but his reasonable error does not render his conduct unlawful. If an officer has a particularized and objective basis conducting an investigatory stop, as Officer Clark did here, then briefly detaining individual does not violate the Fourth Amendment. See United States v. Gilliam, 520 F.3d 844, 847 (8th Cir. 2008) (holding seizure was lawful where the totality of the circumstances provided reasonable justification to briefly detain the plaintiff until it was clear that he was not the person named in the arrest warrant). Officer Clark's mistake is not unconstitutional conduct.

8

### b. Reasonableness of Force Used

Reynolds also argues that Officer Clark violated the Fourth Amendment by using an excessive amount of force to detain her. Courts apply an objective "reasonableness" standard in analyzing whether an officer used excessive force in violation of the Fourth Amendment. Plumhoff v. Rickard, 572 U.S. 765, 774 (2014) (citing Graham v. Connor, 490 U.S. 386 (1989)). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396. A police officer's use of force must be viewed in context, and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." Id. (internal quotation marks and citation omitted).

When applying the test for reasonableness under the Fourth Amendment, a court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [she] is actively resisting arrest or attempting to evade arrest by flight." Id. "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397.

Here, Officer Clark was responding to a report of an assault, which is a potentially violent crime, and was told that a woman was fighting with everyone. When Officer Clark arrived on the scene, he observed Reynolds stepping toward Baker and pointing in her face while other individuals were pushing or pulling Reynolds away from Baker. These facts and

9

circumstances would lead a reasonable officer on the scene to conclude that he was intervening in a hostile situation and that Reynolds posed an immediate threat to the safety of others or herself.  When Officer Clark grabbed Reynolds' arm to remove her from the situation, she immediately pulled away, which would cause a reasonable officer to believe that she was resisting or attempting to evade arrest.  Almost immediately after hearing others yell that he had the wrong person, Officer Clark let go of Reynolds' arm.  Approximately 10 seconds elapsed from the time Officer Clark took hood of Reynolds' arm until the time he let go.  Based on these facts and circumstances known to Officer Clark when he arrived on the scene, his use of force was objectively reasonable.

Resisting this conclusion, Reynolds argues that the amount of force used was unreasonable because there was no indication that she posed a threat to anyone or that she was acting aggressively.  Resp. at 11.  Reynolds contends that, "if anything, Ms. Baker presented evidence of public safety risks by the manner [in which] she confronted passengers." Id. However, Baker's earlier confrontations with other passengers occurred before Officer Clark arrived on the scene.  As such, he did not witness Bakers' verbally abusive and unacceptable treatment of others, including Reynolds.  At the time that Officer Clark arrived, the facts and circumstances confronting him were that a woman was fighting at carousel 7, that Reynolds appeared agitated and was stepping toward Baker with her arm outstretched, and that others were trying to push or pull Reynolds away.  It was reasonable for Officer Clark to conclude albeit falsely from these facts and circumstances that Reynolds was the aggressor in the situation. Officer Clark's concern that Reynolds was agitated enough to potentially harm someone was not unfounded; the moment he let go of Reynolds' arm after pulling her away from the disturbance, she turned and punched him in the chest.  See Surveillance Video I at 7:09-11.

Reynolds also argues the level of force used was excessive because the force caused damage to her arm and shoulder. Although the degree of injury is relevant to showing the amount and type of force used, "[t]he degree of injury should not be dispositive, because the nature of the force applied cannot be correlated perfectly with the type of injury inflicted." Chambers v. Pennycook, 641 F.3d 898, 906 (8th Cir. 2011). This is because "[s]ome plaintiffs will be thicker-skinned than others, and the same application of force will have different effects on different people." Id. As such, the focus is on "whether the force applied is reasonable from the perspective of a reasonable officer on the scene at the time the force is used." Id. (emphasis in original). For the reasons already discussed, the force briefly applied by Officer Clark to Reynolds was reasonable in light of the facts and circumstances known to him at the time the force was used.

Because Officer Clark did not violate a constitutional right, he is entitled to qualified immunity on the § 1983 claim for excessive force.

**2. Clearly Established Right**

Even if Reynolds could show that Officer Clark's conduct violated a constitutional right, she cannot show that the right in question was clearly established. "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quotation marks omitted). Stated differently, "existing law must have placed the constitutionality of the officer's conduct beyond debate." District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quotation marks omitted).

The Supreme Court has repeatedly instructed courts to define clearly established law with specificity, rather than "at a high level of generality." Kisela v. Hughes, 584 U.S. 100, 104

(2018). Specificity is particularly important when the Fourth Amendment is at issue. Id. "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." Id. (quoting Mullenix v. Luna, 577 U.S. 7, 13 (2015)).

Reynolds has provided no existing Eighth Circuit precedent that squarely governs the specific facts at issue in this case. Instead, she relies on cases involving greater uses of force such as using pepper spray and mace on non-violent suspects who were not resisting arrest and posed no threat to others' safety. See Resp. at 14. For example, in Tatum v. Robinson, the Eighth Circuit held that an officer's use of pepper spray on a shoplifter who was not resisting arrest and did not pose a threat of harm to others was an unreasonable use of force. 858 F.3d 544, 551 (8th Cir. 2017. In Johnson v. Carroll, an officer was found to have used excessive force when he threw to the ground and maced a non-violent individual who was suspected of a misdemeanor, was not fleeing or resisting arrest, and posed no threat to anyone's safety. 658 F.3d 819, 828 (8th Cir. 2011). Neither one of these cases would put a reasonable officer on notice that the conduct here---pulling and twisting the arm of an individual suspected of being involved in an assault in order to remove that individual from a confrontation where she appeared to be the aggressor---was unconstitutional.

Because Officer Clark's conduct did not violate a clearly established right of which a reasonable officer would have known, he is entitled to qualified immunity on Reynolds' § 1983 claim.

**C. State Law Claims**

Officer Clark argues that he is entitled to official immunity on Reynolds' state law tort claims because his actions were discretionary and he did not act with malice. "[U]nder Minnesota law, a public official is entitled to official immunity from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion." Johnson v. Morris, 453 N.W.2d 31, 41 (Minn. 1990). Discretionary duties require the use of "professional judgment to choose between a variety of options under uncertain circumstances and without the benefit of time for reflection." Welters v. Minnesota Dep't of Corr., 968 N.W.2d 569, 586 (Minn. Ct. App. 2021).

A public official's discretionary conduct is not immune from liability if the official "is guilty of a wilful or malicious wrong." Rico v. State, 472 N.W.2d 100, 107 (Minn. 1991). "Malice is 'the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right.'" Samuelson v. City of New Ulm, 455 F.3d 871, 878 (8th Cir. 2006) (quoting Carnes v. St. Paul Union Stockyards Co., 205 N.W. 630, 631 (Minn. 1925)). The "willful or malicious wrong" exception to official immunity "anticipates liability only when an official intentionally commits an act that he or she has reason to believe is prohibited." Johnson v. Cnty. of Dakota, 510 N.W.2d 237, 240–41 (Minn. Ct. App. 1994) (quoting Rico, 472 N.W.2d at 107).

Here, Officer Clark's actions when responding to the dispatch call of an assault in progress constituted discretionary conduct. See Kelly v. City of Minneapolis, 598 N.W.2d 657, 665 (Minn. 1999) ("[T]he conduct of police officers in responding to a dispatch or making an arrest involves precisely the type of discretionary decisions, often split-second and on meager

13

information, that [the Minnesota Supreme Court] intended to protect from judicial second-guessing through the doctrine of official immunity.").

Additionally, Officer Clark did not act with malice. As discussed above, his conduct was legally justified and he did not violate a known right. Officer Clark is thus entitled to official immunity on Reynolds' state law tort claims.

Because the claims against Officer Clark are barred by qualified and official immunity and the claim against MAC has been voluntarily withdrawn, Defendants' motion for summary judgment is granted and the Complaint is dismissed with prejudice.

## IV.  CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants Officer Matthew Clark and Metropolitan Airports Commission's Motion for Summary Judgment [Docket No. 33] is **GRANTED;** and

2. The Complaint [Docket No. 1] is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

Dated: September 5, 2024

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT COURT